75 N.J. Super. 40 (1962)
182 A.2d 149
EMILY BRODZINSKY, EXECUTRIX OF THE ESTATE OF STANLEY PULEK, PLAINTIFF-APPELLANT,
v.
ISABELLA PULEK, BLOOMFIELD SAVINGS BANK, A BANKING INSTITUTION OF THE STATE OF NEW JERSEY, AND PEDDIE REALTY COMPANY, A NEW JERSEY CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 1962.
Decided June 7, 1962.
*43 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Lester Sandles argued the cause for appellant (Mr. Sandles, on the brief; Mr. A. Nathan Cowen, attorney).
Mr. Victor H. Miles argued the cause for respondent Isabella Pulek.
The opinion of the court was delivered by KILKENNY, J.A.D.
Plaintiff, executrix and principal beneficiary under the last will and testament of her late father, Stanley Pulek, appeals from a judgment of the Chancery Division holding that a certain bond in the sum of $200,000, dated January 5, 1960, and the securing real estate and chattel mortgages of even amount of the *44 same date, running in favor of the decedent, Stanley Pulek, and the defendant, Isabella Pulek, who was his wife, passed upon the death of Stanley Pulek on September 10, 1960 to the wife, Isabella Pulek, as surviving joint tenant, pursuant to N.J.S.A. 46:2D-1.
The judgment under review also determined that the defendant, Isabella Pulek, was entitled to be reimbursed from decedent's estate in the sum of $927.48 for an insurance premium paid by her, and the further sum of $23,799.04 advanced by her to satisfy a real estate mortgage on the business premises; and that she was entitled to be indemnified from the decedent's estate for any income tax claim that may be established against her in connection with the sale of the business. While the appeal is "from the whole of the final judgment" entered on November 8, 1961, the three points advanced by plaintiff in her brief and at oral argument for a reversal of the judgment relate only to plaintiff's alleged rights in the aforesaid bond and mortgages. Accordingly, we consider only that phase of the judgment.
The factual and legal issues involved herein have been comprehensively set forth in the opinion of the Chancery Division, reported in 70 N.J. Super. 63 (Ch. Div. 1961). We need not repeat them in extenso here. Our task is to determine whether the trial court's fact findings have adequate evidentiary support and whether proper legal conclusions have been drawn therefrom. While we may, and should when the record so warrants, make new or amended findings of fact in a case such as this, tried without a jury, having given due regard to the opportunity of the trial court to judge of the credibility of the witnesses, R.R. 1:5-4(b), we have been advised by our Supreme Court that "great care must be exercised not to transfer the proceeding into a completely de novo examination of the proof. * * * When the facts and inferences arising from them are not in dispute, there is rarely room for differences in their evaluation at the trial or appellate level. *45 But when the result of the contest must turn on the truthfulness of the witnesses, the superior advantage of the trial judge in seeing and hearing and appraising the disputants must ordinarily be regarded as the fulcrum on which the issue should be resolved." Abeles v. Adams Engineering Co., Inc., 35 N.J. 411, 423-424 (1961). Thus, where credibility is the important factor "the conscientious conclusion of the trier of the facts as to which witnesses were more worthy of belief must be given great weight and accepted by the appellate tribunal unless clearly lacking reasonable support." Abeles, supra, 35 N.J., at p. 427. With these mandates in mind, we have made our own independent review of the record.
We adopt as true the following basic facts which appear in the trial court's findings. The late Stanley Pulek and the defendant, Isabella Pulek, were married in May 1952 and remained as husband and wife until Stanley's death. Each had been previously married, and the plaintiff is Stanley's daughter by a prior marriage. Before his marriage to the defendant, Stanley operated a tavern and restaurant known as Stanley's Anchor Inn, at 105 Hawthorne Avenue, Newark, New Jersey. Upon their marriage the defendant took an active interest in the operation of the business, which subsequently prospered. In November 1953 Stanley and Isabella, his wife, acquired the stock interest in Peddie Realty Company, the corporation which owned the real estate upon which the business was conducted, and which subsequently acquired an adjoining parcel. The Peddie Realty Company stock was equally distributed between Stanley and the defendant. In 1955 the tavern license was issued in the names of both Stanley and Isabella and they overtly operated the business thereafter as partners.
The marriage between Stanley and Isabella "was a rocky one," according to the finding of the trial judge. On July 16, 1954 they entered into a separation agreement prepared by Michael L. Mango, who essentially was Mr. Pulek's attorney but on occasion represented both of them *46 in connection with their marital and business affairs. The defendant returned to her husband in December 1954, and thereafter they worked together in the tavern and restaurant business.
In December 1959 the decedent was anxious to sell the business, and ultimately the defendant wife concurred. An agreement of sale was entered into under date of December 8, 1959 with John Peterson and William Speros as buyers. This agreement provided for the sale of all the issued shares of stock of the Peddie Realty Company and all the right and title of Stanley and his wife Isabella in the tavern and restaurant business, including the liquor license, for the sum of $240,000. There was a down payment made of $40,000. Title was closed on January 5, 1960. Pursuant to the contract there were delivered to Stanley Pulek and his wife Isabella at the closing, the following instruments which are the subject of this litigation:
(a) Bond  Peddie Realty Company to Stanley Pulek and Isabella Pulek in the principal sum of $200,000 with interest at 5%, said principal and interest payable in monthly installments of $1,283.44 for a 21-year period.
(b) Real estate mortgage from Peddie Realty Company to Stanley Pulek and Isabella Pulek in the principal sum of $200,000, providing for the same monthly payments as prescribed in the bond.
(c) Chattel mortgage from Stanley's Anchor Inn Corp. to Stanley Pulek and Isabella Pulek covering the fixtures and equipment in the tavern and restaurant premises, likewise in the principal sum of $200,000 and providing for the same monthly payments.
The aforesaid bond and mortgages, running to Stanley Pulek and Isabella Pulek, did not specify on their face the manner in which Stanley and his wife had title thereto, thus giving rise to the issue to be resolved as to whether they held title as joint tenants under N.J.S.A. 46:2D-1, with a right of survivorship, or as tenants by the co-partnership, or as tenants in common without a right of survivorship.
*47 N.J.S.A. 46:2D-1, effective in its present form since July 13, 1951, provides:
"When any mortgage, covering real estate or chattels or both, shall hereafter be made and executed to, or assigned to, any husband and wife, such mortgage shall be held by such husband and wife as joint tenants and not as tenants in common, both as to the legal estate and the beneficial interest or debt thereby secured, unless otherwise therein provided."
Plaintiff challenged the constitutionality of N.J.S.A. 46:2D-1 in the trial court on the ground that the statute, taken literally, renders inquiry into intent irrelevant, and hence is a denial of due process of law. The trial court properly concluded that the statute was constitutional, pointing out that it did not constitute a bar to an action for reformation where the proofs may establish that the parties intended to acquire the mortgages as tenants in common. See In re Kolbeck, 27 N.J. Super. 135 (App. Div. 1953). This statute is comparable to other legislative enactments dealing with the law of property and establishing the rights of persons in property where a contrary intention does not appear. See, for example, R.S. 46:3-17 changing the common law rule in favor of joint tenancies and substituting the modern rule in favor of tenancies in common. N.J.S.A. 46:2D-1 does not create a conclusively presumed intention, as was attempted in the case of N.J.S.A. 17:9A-216 dealing with trust accounts in banks, and is therefore not subject to the criticism pointed out in Howard Savings Institution v. Quatra, 38 N.J. Super. 174, 179 (Ch. Div. 1955).
"Equity looks to the substance, rather than the form." Under this familiar equitable maxim, the real intention of the parties is the dominant test for evaluating the legal effect of a particular instrument. Thus, a deed absolute on its face will be construed in equity as a mortgage, if the latter was what the parties intended. Papsco v. Novak, 94 N.J. Eq. 642, 644 (Ch. 1923); Antonucci *48 v. Gravina, 134 N.J. Eq. 79, 81 (Ch. 1943). So, too, a conveyance to a husband and wife as tenants by the entirety has been judicially converted into a sole ownership in the wife to achieve an equitable result. Luebbers v. Luebbers, 97 N.J. Eq. 172 (Ch. 1925). Again, when "the written instrument fails to express the real agreement or transaction," either through a mistake common to both parties, or through the mistake of one party accompanied by the fraudulent knowledge and procurement of the other, there may be reformation. Downs v. Jersey Central Power & Light Co., 117 N.J. Eq. 138, 141 (E. & A. 1934). However, there must be clear and convincing proof "that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be; and as, in fact, it was but for the alleged mistake in its drafting." Kuller v. Fire Ass'n of Philadelphia, 124 N.J. Eq. 473, 475 (Ch. 1938).
Plaintiff first contends that N.J.S.A. 46:2D-1 is not applicable to the subject mortgages because they are purchase money mortgages given to secure the unpaid balance of the purchase price of partnership assets sold by Stanley and Isabella Pulek and, as such, constitute partnership property. There is no doubt that the tavern and restaurant business, part of the subject matter of the sale for which the mortgages were given, was a partnership asset. The trial court made no finding as to whether the real estate owned by Peddie Realty Company, or the shares of stock in that corporation held equally by Stanley Pulek and his wife, were partnership assets. We find it unnecessary to make such a finding. If the tavern alone, or the tavern and the real estate, were partnership assets, the purchase money mortgages did not necessarily become partnership property, so far as Stanley and his wife were concerned. They could have held these mortgages as individuals, rather than as a co-partnership, if that was their intention. There is nothing to prevent partners, in their relations inter se, from selling lock, stock and barrel, their partnership business, *49 dissolving the firm, and taking as their distributive shares a co-ownership, as individuals, in the purchase money mortgages received in part payment of the purchase price for the partnership assets.
We are not concerned here with the rights of partnership creditors to follow partnership assets and to assert their priorities therein over individual creditors of the members of the firm. Also, the fact that the partnership continues after dissolution for the purposes of liquidation does not preclude the partners from making a distribution of assets as between themselves.
We are satisfied that upon sale of the business and real estate, with the consequent dissolution of the partnership, Stanley and Isabella Pulek did not intend to hold the purchase money mortgages as a copartnership. Their conduct exhibited a contrary intention, generated undoubtedly by their strained relationship. They requested the buyers to make out separate checks to each of them for one-half of the monthly payments. This was done for a brief period until the Puleks, on May 4, 1960, entered into an agreement with the Bloomfield Savings Bank, whereby the bond and mortgages were delivered to the bank as custodian, and the bank received the monthly payments and remitted one-half to defendant and one-half to decedent. Thus, none of the payments passed into or through any partnership account, or was used for any partnership purpose. Each of the parties wanted and had control of his own one-half of the payments received. Since the mortgages were never regarded as a partnership asset by the parties themselves, we conclude that they never intended their holding thereof to be as tenants by the copartnership.
Plaintiff's second contention is that, if a joint tenancy was created by N.J.S.A. 46:2D-1, the joint tenancy was converted into a tenancy in common during the lifetime of the husband by the subsequent agreement and conduct of the parties. A joint tenancy may be converted into a tenancy in common either by the mutual agreement *50 of the joint tenants or by the unilateral act of one of them in alienating or transferring his interest in the jointly owned property so as to destroy one or more of the four constituent unities of interest, title, time and possession. Steinmetz v. Steinmetz, 130 N.J. Eq. 176, 179 (Ch. 1941); Thompson, Real Property, sec. 1780, p. 28, and sec. 1782, p. 35. "A joint tenancy may be terminated altogether by mutual agreement between the parties or by any conduct or course of dealing sufficient to indicate that all parties have mutually treated their interests as belonging to them in common." 48 C.J.S. Joint Tenancy § 4, p. 928. See, too, 64 A.L.R.2d, pp. 949-950, in which the following appears:
"A course of dealing followed by joint tenants in reference to the property jointly owned may by implication establish a severance, termination, or abandonment of the joint tenancy.
In Crooke v. De Vandes (1805), 11 Ves. Jr. 330, 32 Eng. Reprint 1115, Lord Eldon stated that the question of severance of a joint tenancy is mere matter of evidence, that it is not necessary to show a specific act of division of each part of the property `if there has been a general dealing, sufficient to manifest the intention to divide the whole.'
`There may be a severance by any course of dealing sufficient to intimate that the interests of all were mutually treated as constituting a tenancy in common.' Williams v. Hensman (1861), 1 Johns. & H. 546, 70 Eng. Reprint 862, supra, Sec. 20."
The joint tenancy in these mortgages, created by operation of law, was not severed by the unilateral act of either joint tenant during Stanley's lifetime. Neither transferred his or her interest in the mortgages to some third person, although Stanley approached one of the buyers of the business and realty, Peterson, on the day after title closed to see whether he would buy Stanley's "half interest in the mortgage." There was also no express mutual agreement by which the parties undertook in so many words to convert the statutorily created joint tenancy into a tenancy in common.
*51 Plaintiff urges that the May 31, 1960 separation agreement between the parties effected a termination of the joint tenancy, in that it constituted, in essence, a property settlement preliminary to a contemplated divorce. However, there was no express provision in that agreement providing for a severance of the joint tenancy or dealing specifically with the $200,000 bond and mortgages. It did contain other provisions by which Stanley was to release his interest in certain real estate held by them as tenants by the entirety, and all claims and interest in any of the defendant's "money, jewelry, furniture, household goods or any other asset she now has" so that "she may enjoy an absolute power of disposition over the same as though she was a feme-sole and unmarried." This agreement also provided that the decedent would release all "his right, title and interest in any other asset belonging to said Isabella Pulek." We do not find any expression in the general language of this separation agreement, which per se evidences an intention to convert a joint tenancy in the subject bond and mortgages into a tenancy in common. Of course, the mere separation of a husband and wife will not destroy a joint tenancy.
We have noted above that "a course of dealing by joint tenants in reference to the property jointly owned may by implication establish a severance, termination, or abandonment of the joint tenancy." 64 A.L.R.2d, pp. 949-950. Was the conduct of the parties and the course of dealing between them "sufficient to indicate that all parties mutually treated their interests as belonging to them in common"? 48 C.J.S. Joint Tenancy § 4, p. 928. Assuming that a joint tenancy in the mortgages was created by N.J.S.A. 46:2D-1, we are satisfied that the parties mutually treated their interests therein as belonging to them in common and that their course of dealing in reference to the mortgages established by implication a severance, termination and abandonment of such a joint tenancy.
We have already noted that Stanley and his wife insisted from the very beginning upon separate checks to each for *52 one-half of the monthly mortgage payments; that they reiterated that policy of severed payments after delivering the bond and mortgages to the Bloomfield Savings Bank under the custodian agreement; that Stanley began attempts to sell his one-half interest in the mortgages on the day after closing title; that in the May 31, 1960 separation agreement fixing their property settlement no mention was made of any right of survivorship in these mortgages. While these facts, standing alone, are not inconsistent with a joint tenancy, they must be considered along with the further following facts as evidence of a course of dealing probative of a tenancy in common.
The marital relationship, a second marital venture for each, was not the harmonious kind. The strained feelings do not give rise to an implication that each desired the other to enjoy a right of survivorship in this very sizeable asset. Stanley's half interest in the $200,000 mortgages was his principal asset. Only three months prior, on October 30, 1959, he stated in his last will and testament, in which he designated his daughter by his prior marriage as principal beneficiary of his estate, that he made no provision for his wife because "I made ample provision for her and gave her an interest in my business and investments."
Mrs. Pulek also exhibited her understanding that their holding of the mortgages was not as joint tenants, but rather as tenants in common. She insisted from the beginning, before the mortgages were drawn and thereafter, that the monthly payments on account of the mortgages must be in two separate checks, one for her and one for her husband. Her insistence on the separate checks induced Mango, the attorney, to believe that she and her husband intended that the mortgages to be prepared by him were to run in their favor as tenants in common. He testified that he drew the instruments with the intention of creating a tenancy in common and that he was then ignorant of the statute, N.J.S.A. 46:2D-1, and its opposite effect. While the trial judge described Mango's testimony in another *53 regard as "incredible," he did not so characterize the testimony just referred to.
Later, when Mrs. Pulek consulted Mango to prepare the May 31, 1960 separation agreement, the gist of her instructions to him, according to his testimony, was that "she wanted a separation agreement drawn so that he would not bother her any further, and she wouldn't bother him, that the certain properties or assets which they had would belong to each separately, and she just wanted to end her married life with him. * * * whatever property she owned was to be her own separate property, and whatever property he owned was to be his separate property without any interference from each other." She disclaimed at trial that she was then referring to jointly owned property.
However, on September 8, 1960, only two days before her husband committed suicide and while they were living separate and apart, she wrote him a note, in apparent exasperation at his conduct in coming to her for money when she was ill, stating therein:
"Please do not bother me again, as I can't take it. * * * Stan, I don't want any part of your mortgage as I have my own and I want my cash for myself for the stock market. I gave you more than half of all my money. I can't do any more." (Emphasis added)
So far as we are aware, the only mortgage Stanley had and to which she was referring was his share of the $200,000 mortgage in both names.
Again, when Mango, in an effort to escape prosecution for embezzling her funds, came to her after her husband's death with a typewritten sheet and proposed that it be inserted as a substitute for a page in the May 31, 1960 separation agreement, which insert specifically provided that in the event Stanley predeceased her, she was to receive his one-half interest in the mortgages to her absolute use, she refused his proposition of the insert in exchange for her forgetting about his embezzlement of her funds, but she then asserted *54 no right to the entirety of the mortgages as a surviving joint tenant. Instead, as she testified:
"I told him I wouldn't do it; that I did not want anything that was not coming to me."
If she had understood that she had a right of survivorship in these mortgages, her response to Mango would hardly have been couched in those words.
The trial court observed, "Mango's testimony respecting the proposed insert was incredible." The trial judge obviously was referring to Mango's testimony that the insert was drawn as the result of a conversation he had with defendant. The defendant herself testified to the episode as we have described it. Furthermore, Mango's abortive attempt to substitute the insert in order to establish a right of survivorship in Mrs. Pulek's favor in these mortgages adds credence to his assertion that he understood that the instruments prepared by him created only a tenancy in common, due to his lack of awareness of N.J.S.A. 46:2D-1.
Thus, the cumulative effect of all the evidence clearly and convincingly persuades us that Mr. and Mrs. Pulek, by their conduct and course of dealing, mutually treated the subject mortgages as held by them as tenants in common, so that even if we assume that a joint tenancy therein was initially created under N.J.S.A. 46:2D-1, the parties themselves thereafter terminated it and by mutual understanding converted it into a tenancy in common.
While not necessary, in view of the above determination, we deem it expedient for the sake of completeness to consider plaintiff's third and final point. She maintains that a tenancy by the copartnership, or at least a tenancy in common was intended, but that the instruments prepared by Mango, the attorney, failed to express that intention because of his ignorance of the statute and a mutual mistake *55 of law. She argues that these facts warrant relief by way of reformation to eliminate the right of survivorship.
We are not concerned here with any claim of a unilateral mistake on the part of one of the parties coupled with fraud or unconscionable conduct on the part of the other party, which would give rise to relief by way of reformation. 3 Pomeroy's Equity Jurisprudence (5th ed. 1941), § 847. There is no evidence of any inequitable conduct on the part of Mrs. Pulek which caused these mortgages to be drawn as they were. However, as the trial court correctly stated the rule applicable here:
"Equity will also afford relief if, after making an agreement, in the process of reducing it to a written form, the instrument by means of a mistake of law fails to express the contract which the parties actually entered into. 3 Pomeroy's Equity Jurisprudence, § 845 (5th ed. 1941)."
See, too, Kerr on Fraud and Mistake (7th ed. 1952) pp. 550-551. Do the facts in the instant case justify an application of that rule?
There were no discussions or specific instructions between the Puleks and their attorney, Mango, before the mortgages were drawn as to the form of ownership thereof, except that the mortgages were to be in both names and there were to be separate monthly checks for the two mortgagees. From his knowledge of the circumstances of the parties, their strained marital relations, the insistence upon separate checks, and that these were purchase money mortgages in part payment of assets being transferred, which the parties had owned without right of survivorship, Mango believed that their intention was to have a tenancy in common, although nothing was said particularly negating the idea of survivorship. Mango testified that he did not know about N.J.S.A. 46:2D-1 and, therefore, couldn't and didn't explain its effect to the parties. Without knowledge of that statute, Mango understood that the instruments drawn by him created a tenancy in common and that such a tenancy was what the parties intended to create.
*56 If Mr. and Mrs. Pulek intended a tenancy in common, it is clear that, in the process of reducing their understanding to written form, the scrivener by ignorance or mistake of law failed to express that intention because the form employed, under N.J.S.A. 46:2D-1, created a joint tenancy. We believe that the evidence compels the conclusion that Mr. and Mrs. Pulek intended to be co-owners of these mortgages without a right of survivorship, as they had been owners theretofore of the partnership business and shares in the corporation without a right of survivorship. Their mutual conduct subsequent to the receipt of these mortgages fortifies the conclusion that they intended from the outset to hold these mortgages as tenants in common and that the failure to express that intention was due to the scrivener's ignorance and misconception of the law, as well as to the mutual mistake of the parties as to the legal consequences of the form in which the mortgages were cast.
That portion of the judgment of the Chancery Division holding that a joint tenancy existed in these mortgages is reversed and judgment will be entered declaring that Stanley Pulek and Isabella Pulek were tenants in common of these mortgages at the time of his death. In all other respects, the judgment is affirmed. Costs to the appellant.