**Certiorari Granted, December 20, 2010, No. 32,707**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-003**

**Filing Date: October 19, 2010**

**Docket Nos. 28,248; 28,263**

**EDWIN SMITH, LLC, a New Mexico limited
liability company, and JERRY T. WALMSLEY,
trustee of the June Walmsley Bypass Trust under
the Will of June H. Walmsley dated April 7, 1992,**

       **Plaintiffs-Appellees,**

**v.**

**KRISTI CLARK, F. KEVIN KURTZ, and
F. NORMAN KURTZ,**

       **Defendants-Appellants,**

**and**

**EDWIN SMITH, LLC, a New Mexico limited
liability company, and JERRY T. WALMSLEY,
trustee of the June Walmsley Bypass Trust under
the Will of June H. Walmsley dated April 7, 1992,**

       **Plaintiffs-Appellees,**

**v.**

**SYNERGY OPERATING, LLC, a New Mexico
limited liability company, ANNEMARIE KELLER,
CHARLA VARNER; JODIE YATES-SIMON;
KIMBERLY BRAUTIGAM; ROBERT E. KOUNS;
and THEROLYN K. WILLIAMS,**

       **Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**

1

**Karen L. Townsend, District Judge**

Sutin, Thayer & Browne, P.C.
C. Shannon Bacon
Kerry Kiernan
Derek V. Larson
Albuquerque, NM

Montgomery & Andrews, PA
J. Scott Hall
Santa Fe, NM

for Appellees

Finch & Olson PA
Kyle M. Finch
Farmington, NM

Holland & Hart, LLP
Larry J. Montaño
Santa Fe, NM

for Appellant Synergy Operating, LLC

Dixon, Scholl & Bailey, P.A.
Gerald G. Dixon
Albuquerque, NM

for Appellants Kristi Clark, F. Kevin Kurtz, & F. Norman Kurtz

## OPINION

**CASTILLO, Judge.**

**{1}** In this consolidated case, we review the law of joint tenancies in New Mexico as it applies to property in a quiet title action. We also evaluate whether the district court had authority to order proceeds suspended from two wells situated on the property. We affirm the district court's determination as to the quiet title issue, dismiss the proceedings regarding suspension of proceeds for lack of subject matter jurisdiction, and remand this matter for further proceedings consistent with this opinion.

## I.     BACKGROUND

**{2}** The subject property is a 160-acre tract of land located in San Juan County, New

Mexico (the Property).  We begin with a summary of the title history of the Property and basic information related to the development of two gas wells on the Property.  Additional facts will be developed in the context of the issues discussed.

## A.      Title History

{3}     The pertinent history of title to the Property stretches over a period of more than a half century.  The first material event occurred in 1951 when Margaret, Julia, May, and Jennie Hasselman (collectively, the Hasselman Women) acquired by intestate succession an undivided one-half interest in the surface and mineral rights of the Property.  On April 26, 1951, the Hasselman Women conveyed their entire interest in the Property to May's husband.  Immediately thereafter, May's husband conveyed the Property back to the Hasselman Women as joint tenants.  The language of the deed from May's husband to the Hasselman Women explicitly stated:  "Not in tenancy in common but in joint tenancy[.]"

{4}     In June 1958, the Hasselman Women filed a quiet title action in the San Juan County District Court.  The judgment, entered in August 1958, quieted title to the Property as follows:  the Hasselman Women were decreed the owners of an undivided one-half interest in the surface and mineral rights; Claude Smith was decreed the owner of the other one-half interest in the surface rights as well as a 75/160 mineral interest; George B. Robbins was decreed the owner of a 4/160 mineral interest; and J.R. Robbins was decreed the owner of a 1/160 mineral interest.  Appellee Edwin Smith, LLC (Smith) is the successor in interest to the ownership interest of Claude Smith.

{5}     May died in November 1962.  Julia died in November 1973.  Margaret died in May 1974. In September 1981, Jennie executed a warranty deed conveying an undivided one-half interest in the property to herself and her daughter June as joint tenants.  In this deed, Jennie is described as the last "surviving joint tenant of" the Hasselman Women.  Appellee Jerry Walmsley (Walmsley) is the surviving spouse of June.

{6}     Jennie died in July 1988.  June died in October 1995.  In her will, June established the June H. Walmsley Bypass Trust (the Trust) under which Walmsley was named administrator and sole trustee.  June devised her interest in the Property to the Trust.  We recognize that Walmsley is acting in his capacity as trustee in this appeal, but will continue to refer to him as Walmsley.

## B.      Synergy's Development of Mineral Interests on the Property

{7}     During and after October 2004, various heirs of May, Julia, and Margaret assigned mineral rights on the Property to Appellant Synergy.  Synergy also signed a farm-out agreement with Joseph C. Robbins, an heir of J.R. Robbins, and a joint operating agreement (JOA) with Walmsley authorizing Synergy to operate wells on the Property.

{8}     On May 24, 2005, Synergy filed an application with the Oil and Conservation

Division (the Division) of the New Mexico Energy, Minerals, and Natural Resources Department to pool mineral interests on the Property to form a 320-acre compulsory-pooled gas spacing unit and to drill a well, well 104. Walmsley and Smith opposed this application, claiming that Synergy did not possess an interest in the Property.

{9}     Despite Walmsley and Smith's opposition, the Division granted Synergy's application. Walmsley and Smith appealed that decision to the New Mexico Oil Conservation Commission (the Commission), the supervising agency for the Division, challenging Synergy's right to drill on the basis that Synergy did not possess any interest in the Property. Walmsley and Smith also filed a complaint to quiet title to the property in the Eleventh Judicial District Court (the 2006 quiet title action).

{10}     At the Commission hearing on well 104, Synergy claimed its right to drill well 104 derived from three sources: a twenty-five percent mineral interest it obtained from the heirs of Julia and May; the farm-out agreement it held with Joseph C. Robbins, an undisputed owner of a 3.125 percent mineral interest on the Property; and the JOA with Walmsley. Walmsley and Smith refuted these contentions. They claimed that the heirs of Julia and May owned no interest in the Property and that Walmsley was the owner of the entire interest of the Hasselman Women. Therefore, according to Walmsley, Synergy could not derive an interest in the Property from the heirs of Julia and May. Walmsley and Smith also submitted an affidavit and unsworn statement from Joseph C. Robbins that they claimed showed that he had rescinded his farm-out agreement. It is unclear whether Walmsley and Smith challenged Synergy's claim under the JOA. In addition to asking the Commission to find that Synergy possessed no interest in the Property, Walmsley and Smith also asked the Commission to suspend all proceeds from well 104.

{11}     After the Commission hearing, but before the Commission rendered a decision on Synergy's right to drill well 104, Synergy filed another application with the Division to pool mineral interests on the Property and drill a second well, well 105. Synergy again based its right to drill on the twenty-five percent mineral interest it allegedly obtained from the heirs of Julia and May, the farm-out agreement, and the JOA. Smith and Walmsley again objected to the application on the ground that Synergy did not possess any interest in the Property.

{12}     In March 2006, the Commission entered an order regarding well 104. The Commission first observed that it lacked jurisdiction to make any determination regarding title to the Property. The Commission then found that there was no admissible evidence submitted to support Walmsley and Smith's claim that Joseph C. Robbins rescinded the farm-out agreement. Accordingly, the Commission concluded that Synergy was entitled to drill well 104 pursuant to the farm-out agreement and pursuant to the JOA. Because Synergy possessed the right to drill well 104, the Commission concluded that pooling all uncommitted interests on the Property was appropriate to avoid the drilling of unnecessary wells, to protect correlative rights, to prevent waste, and to achieve an efficient distribution of the natural resources underlying the Property. The Commission also authorized Synergy to recoup costs associated with the drilling, operating, and supervising of well 104 from the

4

proceeds of that well. The Commission did not grant Walmsley and Smith's request to suspend proceeds.

**{13}** Following the entry of the March 2006 order, Walmsley filed a motion to suspend proceeds from well 104 in district court under the docket number that was generated from Walmsley and Smith's complaint to quiet title. Smith did not join the motion to suspend proceeds filed in district court. In his motion, Walmsley requested that the district court place 100 percent of the proceeds attributable to the disputed interest in well 104 into a suspense account pending the resolution of the 2006 quiet title action.

**{14}** In September 2006, the Division granted Synergy's request to pool mineral interests and drill well 105. The Division based its decision on the fact that Synergy had a farm-out agreement with Joseph C. Robbins, an undisputed owner of mineral rights on the Property. By virtue of that interest, the Division concluded that Synergy had the right to drill. Accordingly, the Division authorized Synergy to pool mineral interests. The Division further authorized Synergy to recoup costs associated with drilling, operating, and supervising well 105 from proceeds derived from the well. The Division rejected the requests of Walmsley and Smith to suspend proceeds from well 105 until the quiet title action was resolved. According to the Division, suspending proceeds from well 105 would preclude Synergy from recouping its expenses. After this order was entered, Walmsley amended the motion to suspend proceeds filed in district court to include 100 percent of the proceeds attributable to the disputed interest in well 105.

**{15}** In February 2007, the district court granted the amended motion to suspend proceeds from wells 104 and 105 and later denied Synergy's motion to reconsider that order. The district court ordered that all of the proceeds derived from wells 104 and 105 be placed in an interest bearing account until a final allocation of the interests in the Property was determined. Pursuant to a stipulation from the parties, the order was later amended to apply only to those proceeds derived from the disputed interest.

**{16}** On November 30, 2007, the district court entered an order resolving the quiet title action. The following is a summary of the district court's conclusions. Jennie, as the last surviving member of the Hasselman Women, acquired the one-half undivided interest in the Property that had originally been held by the Hasselman Women as joint tenants. That interest, upon Jennie's death, vested in June. Upon June's death, her interest was devised to the bypass trust established in her will. Title to the disputed interest was quieted in favor of the Trust.

## II.    DISCUSSION

**{17}** On appeal, Synergy challenges the district court's order regarding the title to the Property as well as the order suspending proceeds from both wells. We will address the title questions first and then turn to the issue of suspension of proceeds.

## A.    The Quiet Title Action

**{18}**    The district court quieted title in favor of the Trust.  Synergy asserts two points of error.  It relies on the conveyance that created the joint tenancy interest in the Hasselman Women and argues that a joint tenancy among the sisters never came into existence because May failed to sign that deed.  Alternatively, Synergy contends that even if a joint tenancy were created, the Hasselman Women treated the joint tenancy as if it were a tenancy in common and, thus, the joint tenancy was severed.  We begin with the standard of review and follow with a discussion of the law of joint tenancies.

### 1.    Standard of Review

**{19}**    The district court resolved the 2006 quiet title action on the parties' cross-motions for summary judgment.  "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Weise v. Washington Tru Solutions, L.L.C.*, 2008-NMCA-121, ¶ 2, 144 N.M. 867, 192 P.3d 1244 (internal quotation marks and citation omitted).  "[W]here the parties agree to have the trial court decide a case on cross-motions for summary judgment and where neither party claims that disputed facts exist, this Court will review the case as presented by the parties and decide it one way or the other." *Farmington Police Officers Ass'n Commc'n Workers of Am. Local 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 33, 139 N.M. 750, 137 P.3d 1204 (Pickard, J., specially concurring in part and dissenting in part).  Our review of the parties' arguments on appeal regarding the 2006 quiet title action reveals that the facts are not disputed.  Rather, the parties' disagreement centers on the significance of the undisputed facts as a matter of law—in this case, the law of joint tenancies.

### 2.    The Law of Joint Tenancies

#### a.    Historical overview

**{20}**    A joint tenancy is a concurrent estate that dates back to the thirteenth century under the early common law.  R. H. Helmholz, *Realism and Formalism in the Severance of Joint Tenancies*, 77 Neb. L. Rev. 1, 4 (1998).  "As the preferred form of common ownership in earlier English law, the joint tenancy's existence was presumed over a tenancy in common in cases where there was doubt about which had been created." *Id.*  "[T]he chief incident of a joint tenancy is the right of survivorship[.]" *Swink v. Fingado*, 115 N.M. 275, 281, 850 P.2d 978, 984 (1993).  Under survivorship, "[t]he joint tenant who survives the other cotenants takes the entire estate; the estates of deceased joint tenants have no interest."  7 Richard R. Powell, *Powell on Real Property* § 51.03[3] (Michael Allan Wolf ed. 2010).

**{21}**    The traditional test for the creation and continuation of a joint tenancy depended upon the presence of the four unities:  time, title, interest, and possession. *Id.*  Describing the four unities, Blackstone wrote in his commentaries that

[t]he properties of a joint estate are derived from its unity, which is fourfold; the unity of interest, the unity of title, the unity of time, and the unity of possession; or, in other words, joint tenants have one and the same interest, accruing by one and the same conveyance, commencing at one and the same time, and held by one and the same undivided possession.

2 William Blackstone, 2 *Commentaries* \*180 (1979) (emphasis omitted).

**{22}**    Soon after achieving independence from Great Britain, Americans abandoned the English legal preference for joint tenancy as the preferred form of concurrent ownership and adopted a preference for tenancy in common.  David A. Thomas, *Anglo-American Land Law:  Diverging Developments from a Shared History - Part III:  British & American Real Property Law & Practice - A Contemporary Comparison*, 34 Real Prop. Prob. & Tr. J. 443, 467 (1999).  Joint tenancies, however, remain in frequent use.  Helmholz, *supra*, at 4.

**{23}**    In 1852, New Mexico enacted the territory's first laws regulating conveyances and allowing joint tenancy.  *See Fletcher's Estate v. Jackson*, 94 N.M. 572, 576, 613 P.2d 714, 718 (Ct. App. 1980) (discussing the 1852 version of the joint tenancy law).  The language from the 1852 law is now complied as NMSA 1978, Section 47-1-15 (1915) ("All interest in any real estate, either granted or bequeathed to two or more persons other than executors or trustees, shall be held in common, unless it be clearly expressed in said grant or bequest that it shall be held by both parties.").  Relying on Section 47-1-15, our Supreme Court stated in *Brown v. Jackson*, 35 N.M. 604, 605, 4 P.2d 1081, 1081 (1931) that "[w]hile it is true that joint tenancy is no longer favored, as at common law, yet it still exists when by grant it is clearly expressed that the estate is to be a joint tenancy."

**{24}**    In 1971, NMSA 1978, Section 47-1-36 (1971) was enacted.  This statute defined the joint tenancy as it relates to real property and established the prerequisites for creating a joint tenancy in real property.  *Swink*, 115 N.M. at 286, 850 P.2d at 989.  Section 47-1-36 provides the following:

> A joint tenancy in real property is one owned by two or more persons, each owning the whole and an equal undivided share, by a title created by a single devise or conveyance, when expressly declared in the will or conveyance to be a joint tenancy, or by conveyance from a sole owner to himself and others, or from tenants in common to themselves, or to themselves and others, or from husband and wife when holding as community property or otherwise to themselves or to themselves and others, when expressly declared in the conveyance to be a joint tenancy, or when granted or devised to executors or trustees.

**{25}**    Our Supreme Court has previously acknowledged that Section 47-1-36 embraces the classical doctrine of the four unities.  *See Swink*, 115 N.M. at 286, 850 P.2d at 989.

**b.      Creation of a joint tenancy**

**{26}**    As we have explained, the doctrine of the four unities both describes the nature of a joint tenancy and was at common law the touchstone for determining whether a transfer of real property resulted in a joint tenancy. 4 David A. Thomas, *Thompson on Real Property* § 31.06(b) at 15 (2d ed. 2004).  The case law predating the enactment of Section 47-1-36 shows that this common law tradition prevailed in New Mexico. *See In re Trimble's Estate*, 57 N.M. 51, 54, 253 P.2d 805, 807 (1953) ("[a] joint tenancy arises where two or more persons have any subject of property jointly in which there is a unity of interest, unity of title, unity of time, and unity of possession" (internal quotation marks and citation omitted)), *superseded by statute as stated in Fletcher's Estate*, 94 N.M. at 576, 613 P.2d at 718. Because Section 47-1-36 embraces this classical doctrine, the test in New Mexico to determine whether a joint tenancy has been established remains whether the requirements embodied by the doctrine of the four unities have been satisfied.  *See Swink*, 115 N.M. at 286, 850 P.2d at 989.  We have previously described what this entails.

> The unities of time and title require that the joint tenants' interests accrue at the same time by the same conveyance.  By unity of interest is meant that the joint tenants' shares are all equal and the duration and quality (legal or equitable) of their estates are the same.  Unity of possession means that each joint tenant is in possession of the whole estate, and that each is also entitled to an equal undivided share of the whole.

*Id.* at 286 n.15, 850 P.2d at 989 n.15 (internal quotation marks and citation omitted).

**{27}**    In addition to satisfying the requirements embodied by the four unities, our statutes require that the document purporting to create the joint tenancy include express language that the real property is to be held jointly.  *See* § 47-1-15 ("All interest in any real estate, either granted or bequeathed to two or more persons other than executors or trustees, shall be held in common, unless it be clearly expressed in said grant or bequest that it shall be held by both parties.").  This statutory requirement is reflective of the modern preference in favor of tenancies in common and, conversely, the now well-entrenched view that joint tenancies are no longer preferred.  *See Brown*, 35 N.M. at 605, 4 P.2d at 1081 ("While it is true that joint tenancy is no longer favored, as at common law, yet it still exists when by grant it is clearly expressed that the estate is to be a joint tenancy.").  A conveyance to two or more grantees that includes the language "as joint tenants" is sufficient to overcome the modern presumption against joint tenancies and satisfies the express language requirement set out in Section 47-1-15.  *See* NMSA 1978, § 47-1-35 (1947) ("In a conveyance or mortgage of real estate, the designation of two or more grantees 'as joint tenants' shall be construed to mean that the conveyance is to the grantees as joint tenants, and not as tenants in common, and to the survivor of them and the heirs and assigns of the survivor.").

**c.      Severing a joint tenancy**

**{28}**   In *Romero v. Melendez*, 83 N.M. 776, 778, 498 P.2d 305, 307 (1972), our Supreme Court discussed severance of joint tenancies.  The Court first established that "[a] joint tenancy will be severed by the destruction of any one or more of its necessary units."  *Id.* (internal quotations marks and citation omitted).  Historically, this was the test to determine whether a joint tenancy had been severed.  *See Mamalis v. Bornovas*, 297 A.2d 660, 661 (N.H. 1972) ("In determining whether an act of a joint tenant is sufficient to terminate or 'sever' a joint tenancy, the courts have historically resolved the question upon an analysis of whether the act destroyed one of the essential four unities of time, title, interest or possession."); *see also* Blackstone, *supra*, at *185.  Thus, it is settled that a conveyance by a joint tenant of his interest to a third party "necessarily destroys the unity of title," and with it, severs the joint tenancy.  2 Tiffany, *The Law of Real Property* § 425, at 209 (3d ed. Jones 1939).

**{29}**   The second way in which a joint tenancy may be severed, as our Supreme Court explained in *Romero*, is "by a mutual agreement between the parties . . ., or by any conduct or course of dealing sufficient to indicate that all parties have mutually treated their interests as belonging to them in common."  83 N.M. at 778, 498 P.2d at 307 (alteration in original).  Synergy claims that, by this language, our Supreme Court adopted a modern development in the law of severance in which courts look not to whether one of the unities has been destroyed to determine whether a joint tenancy has been severed but only to whether the parties intended to sever the joint tenancy.  *See* Helmholz, *supra* at 18-19.  This argument implicates significant policy considerations that Synergy has not addressed.  *See* 4 Thomas, *supra*, § 31.09, at 73-74 (discussing the future of the law of joint tenancies and recognizing that increased emphasis on the intention of the parties in the creation and severance of joint tenancies has contributed to the erosion in the distinctions between tenancies in common and joint tenancies).  Notwithstanding this concern, we are unpersuaded that the modern intent-based theory of severance is compatible with the current statutory framework governing joint tenancies in New Mexico.

**{30}**   As previously discussed, joint tenancies are defined by statute in New Mexico, and Section 47-1-36 embraces the four unities doctrine.  The modern intent-based theory is premised on the abandonment of the four unities doctrine, *see* Helmholz, *supra*, at 1-2, and this is reflected in decisions from jurisdictions that have adopted the modern theory.  *See, e.g.*, *Taylor v. Canterbury*, 92 P.3d 961, 967 (Colo. 2004) (en banc) (observing that the four unities have been abolished by statute in Colorado and, after recognizing the development of the intent based theory, holding that whether a joint tenancy has been created or severed is merely a question of the intent of the parties); *In re Estate of Bates*, 492 N.W.2d 704, 706-07 (Iowa Ct. App. 1992) (observing that the four unities common law rule required to create and continue a joint tenancy is not applicable in Iowa and finding a severance of a joint tenancy based solely on the intent of the parties who agreed to sell certain property but never actually sold it); *Mamalis*, 297 A.2d at 662 (abandoning the requirement that severance of a joint tenancy requires destruction of one of the unities and adopting the intent based approach because, in New Hampshire, all that is required to create a joint tenancy is the manifestation of intent to do so and, therefore, this is all that should be required to sever one).

**{31}** When, in *Romero*, our Supreme Court recognized that a joint tenancy may be severed by mutual agreement or by any conduct or course of dealing sufficient to indicate that all parties have mutually treated their interests as belonging to them in common, the Court did not, as Synergy argues, adopt the modern intent-based theory of severance. Rather, our Supreme Court merely recognized the theory of severance by implication. That a joint tenancy may be severed by implication is widely recognized. *See In re Estelle's Estate*, 593 P.2d 663, 665 (Ariz. 1979) (in banc); *Brodzinsky v. Pulek*, 182 A.2d 149, 154 (N.J. Super. Ct. App. Div. 1962); *Young v. McIntyre*, 672 S.E.2d 196, 203 (W. Va. 2008). Varying language has been used to express the theory. *See Duncan v. Suhy*, 37 N.E.2d 826, 829 (Ill. 1941) (stating that "an agreement between joint tenants to hold as tenants in common will sever an existing joint tenancy and such agreement may be inferred from the manner in which the parties deal with the property"). The language employed by our Supreme Court in *Romero* is but one example and appears in *Corpus Juris*, in exactly the same form, as early as 1924. 33 C.J. *Joint Tenancy* § 11, at 909 (1924). Whether a severance by implication has occurred turns on two questions: (1) whether there was an express agreement between all of the joint tenants; and (2) whether that agreement was inconsistent with one of the unities or with the right of survivorship. *See* Harold J. Romig, Jr. & John M. Shelton, Comment, *Severance of a Joint Tenancy in California*, 8 Hastings L.J. 290, 294 (1957). *Romero* itself is a useful illustration of the application of the doctrine of severance by implication.

**{32}** As a preliminary matter, we observe that *Romero* does not deal with the conveyance of real property which is the issue before us. However, the *Romero* court did discuss severance and held that a joint tenancy had been severed in that case and denied a surviving spouse's claim to right of survivorship over a mutual fund and checking account. 83 N.M. at 778-79, 498 P.2d at 307-08. The Court observed that a divorce decree had been entered before the death of the deceased spouse and concluded that the decree severed the joint tenancy, rendering the accounts the sole and separate property of the estate of the deceased. *Id.* The fact that the parties divorced was not, in and of itself, the basis for the holding. There is little disagreement over the fact that "a divorce decree alone does not effect a severance of a joint tenancy." 48A C.J.S. *Joint Tenancy* § 17, at 347 (1981); *see* 4 Thomas, *supra*, § 31.08(c), at 66. Rather, our Supreme Court reasoned that the divorce decree was inconsistent with and eliminated the unity of possession that severed the joint tenancy. *Romero*, 83 NM at 779, 498 P.2d at 308. The decree was an express agreement that destroyed one of the four unities, a severance by implication. Having set forth the law governing the creation and severance of joint tenancies, we turn to Synergy's arguments in the present matter.

### 3. Synergy's Arguments Regarding Joint Tenancy

**{33}** Synergy's first claim deals with the 1951 deed to the Hasselman Women. Relying on principles of community property law, Synergy contends that the conveyance from May's husband to the Hasselman Women failed to establish a joint tenancy because May did not sign the deed in which her husband conveyed the Property to the Hasselman Women as joint

10

tenants. According to Synergy, this rendered that conveyance void because the conveyance of community property by one spouse acting alone is void.

**{34}** The district court responded to this contention by observing that May conveyed her interest, as had all of her sisters, to her husband before he conveyed their interests back to them as joint tenants. Thus, according to the district court, it was not necessary for May to have signed the conveyance creating the joint tenancy because the Property had momentarily become May's husband's separate property. Synergy claims this reasoning is flawed because it assumes the other Hasselman Women were deeding their interest to May's husband as his sole and separate property and further that this reasoning assumes the Hasselman Women intended to create a joint tenancy through this transaction. We find little merit to these claims.

**{35}** Historically, there was a question as to whether or not an individual could deed title to real property in joint tenancy to himself and others.

> The old common law rule that a grantor could not create a joint tenancy by conveying to himself and another (or others), or by conveying an undivided interest to another, generally has been evaded by conveying the entire estate to a third party "straw man" who, by prearrangement, then conveys the estate back to the entire group of intended joint tenants (including the grantor).

Roger A. Cunningham, William B. Stoebuck & Dale A. Whitman, *The Law of Property*, § 5.3, at 198 (2d ed. 1993). It appears that this is what occurred in this case; May's husband was the straw man. The Hasselman Women deeded the Property to him, and he re-deeded the Property to them as joint tenants. The Hasselman Women accrued the same interest in the Property at the same time by the same conveyance and possessed an equal undivided share in the Property and the conveyance clearly indicated that the Hasselman Women held the property not as tenants in common but as joint tenants. Where a dispute arises as to whether property was initially acquired in joint tenancy, the status of the property may be established by a preponderance of the evidence. *Fletcher's Estate*, 94 N.M. at 578, 613 P.2d at 720 (citing NMSA 1978, § 47-1-16 (1955)). As evidenced by the straw man transaction and the words on the 1951 deed, a joint tenancy was established.

**{36}** Further, Synergy relies on "basic principles of community property law" but does not cite specific statutes or cases. Where a party cites no authority to support an argument, we may assume no such authority exists. *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984). Although we are not certain, it appears that these basic principles may be part of New Mexico's Community Property Act. That legislation was not enacted until 1973, over twenty years after the 1951 conveyances were made. Synergy's arguments are unavailing.

**{37}** Synergy's second argument is based on severance. Synergy contends that even if a

11

joint tenancy were created, the Hasselman Women treated the joint tenancy as if it were a tenancy in common and, thus, the joint tenancy was severed.

**{38}** Synergy points to five different facts as proof of severance in the present matter: (1) the pleadings filed to initiate the 1958 quiet title action and language in the judgment stemming from that action wherein the Hasselman Women are described as the "heirs at law of Herman Hasselman" and "the owners in fee simple;" (2) that the surviving Hasselman Women and May's heirs executed a power of attorney permitting Jennie's husband to develop mineral interests on the Property; (3) that the surviving Hasselman Women designated Jennie as agent to receive payments from a gas company operating on the property and that Jennie, acting as agent for the surviving Hasselman Women, entered into leases to further develop mineral interests on the property; (4) the language in a title opinion rendered by Pan American Petroleum in 1965 indicating that the heirs of the deceased Hasselman Women held interests in the Property; and (5) that heirs of May, Julia, and Margaret received royalties. The evidence Synergy cites as proof the Hasselman Women severed the joint tenancy is insufficient as a matter of law to prove a severance. None of the alleged acts destroyed one of the four unities that is necessary under either mode of severance recognized in New Mexico.

### 4.  Conclusion as to Joint Tenancy

**{39}** The undisputed facts in this matter prove that the Hasselman Women established a joint tenancy. The joint tenancy was not severed. None of the Hasselman Women conveyed their interests in the Property during their lives. Nor did the Hasselman Women sever the joint tenancy by an express agreement inconsistent with one of the four unities or the right of survivorship. Accordingly, upon June's death, the property passed to the Trust.

### B.  Suspension of Proceeds

**{40}** As explained in the background section of this opinion, Walmsley and Smith's original requests to suspend proceeds from both wells were made in conjunction with their objections to Synergy's applications to pool mineral interests on the Property. After the requests were effectively denied by the Division and Commission, Walmsley alone filed a motion in the quiet title action to suspend proceeds as to well 104. Later, he filed an amended motion requesting that proceeds be suspended as to both wells. The arguments made in the administrative proceedings were similar to those made to the district court—essentially that the suspension of proceeds would eliminate unnecessary litigation regarding payment of proceeds pending a final determination of the title dispute. The district court ordered the proceeds suspended and to be placed in an interest-bearing account until a final allocation could take place. Synergy appeals this order.

**{41}** Although Synergy does not actually argue the issue of subject matter jurisdiction on appeal, we posed this question to the parties during oral argument. Jurisdiction is a controlling consideration to be resolved as a preliminary matter, and an appellate court may

raise the question of jurisdiction on its own. *See State v. Doe*, 91 N.M. 356, 357, 573 P.2d 1211, 1212 (Ct. App. 1977). Moreover, "it is incumbent upon the appellate court to raise jurisdiction questions sua sponte when the Court notices them." *Smith v. City of Santa* Fe, 2007-NMSC-055, ¶ 10, 142 N.M. 786, 171 P.3d 300. The question of subject matter jurisdiction is a question of law that we review de novo. *Ottino v. Ottino*, 2001-NMCA-012, ¶ 6, 130 N.M. 168, 21 P.3d 37.

**{42}** To address the question of jurisdiction, we first look to certain provisions of the Oil and Gas Act (the O&G Act), NMSA 1978, §§ 70-2-1 to -38 (1935, as amended through 2010). The O&G Act provides the Division with "jurisdiction and authority over all matters relating to the conservation of oil and gas" and "jurisdiction, authority and control of and over all persons, matters or things necessary or proper to enforce effectively the provisions of th[e O&G A]ct or any other law of this state relating to the conservation of oil or gas." Section 70-2-6(A). The O&G Act further empowers the Division "to make and enforce rules, regulations and orders, and to do whatever may be reasonably necessary to carry out the purpose of th[e] [O&G Act], whether or not indicated or specified in any section [of the O&G Act]." Section 70-2-11(A). The O&G Act provides the Commission with concurrent jurisdiction to carry out these responsibilities. Sections 70-2-6(B), -11(B).

**{43}** The Division and Commission are statutorily authorized to set forth the procedural rules governing the proceedings before them. Section 70-2-7. Pursuant to those rules, adjudicatory hearings must be brought in the first instance before the Division. 19.15.4.8(A) NMAC (12/1/08). The Division's order may be appealed to the Commission for a de novo hearing. Section 70-2-13; 19.15.4.23 NMAC (12/1/08). A party dissatisfied with the Commission's order may request a rehearing before the Commission. Section 70-2-25(A); 19.15.4.25 NMAC (12/1/08). The Commission's decision at the rehearing proceeding may be appealed to the district court. Section 70-2-25(B).

**{44}** Walmsley, dissatisfied with the denial of the request to suspend proceeds from well 104 by the Division and well 105 by the Commission, did not follow the appellate process set forth by statute. Instead, he filed a motion and amended motion to suspend proceeds from both wells in the district court quiet title actions. This procedural tactic, effectively an end-run around the appellate procedures specified in the O&G Act, raises significant concerns that our Supreme Court discussed at length in *Smith*, 2007-NMSC-055, ¶ 21.

**{45}** In *Smith*, there were two sets of plaintiffs—the Smiths and the Stillmans—who wanted to drill wells on property they owned located within the boundaries of a municipality. *Id.* ¶ 3. Separately, they obtained well permits from the Office of the State Engineer after which the municipality notified them that they were also required to obtain municipal permits to drill. *Id.* The Stillmans did not apply for a city permit but the Smiths did. *Id.* ¶ 4. After the city denied the Smiths' applications for a permit, the Smiths followed the administrative appeals process set forth in the letter of denial. *Id.* Ultimately, the city council upheld the decision to deny the permit. *Id.* The Smiths and the Stillmans then filed an action for declaratory relief in district court. *Id.* ¶ 5. The district court granted summary

judgment in favor of them, and the city appealed.

**{46}** Our Supreme Court first looked to the question of jurisdiction. *Id.* ¶¶ 8-10. As to the Stillmans, it concluded that the district court did have jurisdiction to consider the declaratory judgment action. *Id.* ¶ 25 ("By not invoking the administrative review process and the corresponding judicial review procedures embodied in Rule 1-075 [NMRA], the Stillmans were free to initiate their claim for declaratory relief at the time of their own choosing."). As to the Smiths, however, our Supreme Court held that the district court lacked jurisdiction to rule on the claim for declaratory relief. *Id.* ¶ 24. The Court explained that, because the Smiths chose to initiate the administrative appeals process, they were, therefore, required to abide by the procedural mechanisms that governed that process. *Id.* ¶ 23. "To hold otherwise," the Court stated, "would invite chaos and preclude certainty in the finality of administrative decisions that might otherwise be subject to multiple avenues of judicial review at unpredictable times." *Id.* The Court explained its reasoning:

> We perceive no sound judicial policy for allowing a party aggrieved by an administrative decision to forego an available avenue of judicial review only to allow that same party to initiate judicial review in another form at some future date that no one can predict or rely upon with any certainty. Indeed, the efficient administration of justice requires just the opposite.

*Id.* ¶ 24.

**{47}** Here, there is no question about the propriety of the quiet title suit—it can properly be brought to decide the title issues related to the property upon which the wells are situated. NMSA 1978, § 42-6-1 (1951). Consideration of the issue of suspension of proceeds from the mineral interests on the property is another matter. Suspension of proceeds was first raised as an issue before the Division and the Commission. Neither party challenges the Division and the Commission's authority to hear or decide a request for suspension of proceeds. Once the authority of the Division and the Commission as to suspension of proceeds from the wells was invoked, Walmsley was obligated to comply with the comprehensive appellate procedures provided under the O&G Act that govern the proceedings before those agencies. Because Walmsley failed to follow the applicable statutory procedures, we conclude that the district court lacked subject matter jurisdiction to rule on the motion and amended motion to suspend proceeds. *See Smith*, 2007-NMSC-055, ¶ 24; *In re Application of Angel Fire Corp.*, 96 N.M. 651, 652, 634 P.2d 202, 203 (1981) (observing that, where a statute establishes an administrative procedure for taking a case or controversy out of the administrative framework into the judicial system for review, jurisdiction of the matter in dispute does not lie in the district court until the statutorily required administrative procedure has been complied with).

## III.    CONCLUSION

**{48}** We hold that the district court did not err in concluding that the Property passed to

the Trust.  The district court's order in the quiet title action is affirmed.  Because the district court lacked subject matter jurisdiction regarding the suspension of proceeds, the motion and amended motion filed in the quiet title action are hereby dismissed, and all orders entered based on the motions are hereby vacated.  This matter is remanded for proceedings consistent with this opinion.

**{49}  IT IS SO ORDERED.**

_____
**CELIA FOY CASTILLO, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Chief Judge**

_____
**ROBERT E. ROBLES, Judge**

**Topic Index** *Edwin Smith, LLC v. Clark*, **Docket Nos. 28,248/28,263**

| | |
|---|---|
| **AL** | **ADMINISTRATIVE LAW AND PROCEDURE** |
| AL-AA | Administrative Appeal |
| AL-EX | Exhaustion of Administrative Remedies |
| AL-HR | Hearings |
| AL-JR | Judicial Review |
| | |
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **JD** | **JURISDICTION** |
| JD-SM | Subject Matter |
| | |
| **NR** | **NATURAL RESOURCES** |
| NR-MM | Mines and Minerals |
| NR-OG | Oil and Gas |
| NR-RO | Royalties |
| | |
| **PR** | **PROPERTY** |
| PR-CP | Community Property |
| PR-DP | Disbursement of Proceeds |
| PR-JT | Joint Tenancy |
| PR-LG | Land Grants |

PR-MD     Mineral Deed
PR-MR     Mineral Resources