IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-034

Filing Date: August 24, 2012

Docket No. 32,707

EDWIN SMITH, L.L.C., and JERRY WALMSLEY,

        Plaintiffs-Respondents,

v.

SYNERGY OPERATING, L.L.C. ANNEMARIE KELLER,
CHARLA VARNER, JODI YATES-SIMON, KIMBERLY
BRAUTIGAM, ROBERT E. KOUNS, THEROLYN WILLIAMS,
KRISTI CLARK, F. KEVIN KURTZ, and F. NORMAN KURTZ,

        Defendants-Petitioners.

ORIGINAL PROCEEDING ON CERTIORARI
Karen L. Townsend,  District Judge

Holland & Hart, L.L.P.
Larry J. Montaño
Santa Fe, NM

Dixon, Scholl & Bailey, P.A.
Gerald George Dixon
Spring V. Schofield
Albuquerque, NM

Finch & Olson, P.A.
Kyle Michael Finch
Farmington, NM

for Petitioners

Sutin, Thayer & Browne, P.C.
Sarita Nair
Kerry C. Kiernan
Timothy J. Atler
Albuquerque, NM

1

for Respondents

**OPINION**

**SERNA, Justice.**

**{1}** "There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property." 2 William Blackstone, *Commentaries on the Laws of England* 2 (Univ. of Chicago Press ed. 1979) (1766). The property that has captured the affections of the litigants in this case is a parcel of land located in San Juan County with productive oil and gas wells thereon. While ownership of the land is the ultimate question the parties seek to resolve in the underlying lawsuit, the issue on appeal is narrower—whether, as a matter of law, a joint tenancy in realty may be terminated and converted into a tenancy in common by a mutual course of conduct between the owners that demonstrates their intent to hold the property as tenants in common. We hold that such a course of conduct may effectively terminate a joint tenancy. Accordingly, we reverse the Court of Appeals and remand to the district court for further proceedings.

**I.    BACKGROUND**

**{2}** This case began as a quiet title action filed by Respondents Edwin Smith, LLC and Jerry Walmsley, in his capacity as trustee of the June Walmsley Bypass Trust, against Synergy Operating, LLC and numerous individuals. The property interests of Respondent Edwin Smith, LLC are not at issue in this appeal.

**{3}** The record supports the following sequence of pertinent events. Herman Hasselman died in 1931, leaving to his widow, Margaret Hasselman Jones, and his three daughters from a previous marriage, Julia Hasselman Keller, May Hasselman Kouns, and Jennie Hasselman Hill, his one-half interest in an approximately 160-acre tract of land near Bloomfield in San Juan County (the Property), which he had acquired in or after 1924. Twenty years later, in 1951, Hasselman's widow and his three daughters (collectively, the Hasselman Women), in an apparent "straw man" transaction, executed a deed conveying their interest in the Property to May's husband, Earl Kouns. Earl Kouns promptly deeded his newly-acquired interest in the Property back to the Hasselman Women, specifically providing "'not in tenancy in common but in joint tenancy.'"

**{4}** In 1958, the Hasselman Women filed a lawsuit against numerous defendants in the district court of San Juan County to quiet title to the Property. Within several months the court entered judgment in favor of the Hasselman Women, adjudging them owners in fee simple of the undivided one-half interest in the Property, more particularly described as "AN UNDIVIDED ONE-HALF OF": The Southwest Quarter (SW¼) of Section Eight (8), Township Twenty-Nine (29) North, Range Eleven (11) West, N[ew] M[exico] P[rincipal]

2

M[eridian]."[1]

{5}    The Hasselman Women then undertook a series of actions over the next several decades to lease the Property for oil and gas exploration and production.  The meaning accorded to these actions is central to the outcome of this lawsuit.  In 1959 the Hasselman Women, along with Margaret's and Jennie's husbands, entered into a lease agreement with Hugh J. Mitchell to develop oil and gas  resources on the Property.  The lease agreement purportedly was recorded in San Juan County, but has not been included in the record on appeal.  May died in 1962.  In 1964 the three surviving Hasselman Women, along with Margaret's husband and May's four children, executed a Power of Attorney appointing Henry Hill, Jennie's husband, as their "true and lawful agent and attorney-in-fact for the purpose of granting and conveying easements, surface leases and mineral leases, on and over the [Property], to the extent of our right, title and interest in and to such real estate . . . ." The designation of Power of Attorney formally extended to Henry Hill "full power and authority to do the acts aforesaid as fully as we ourselves could do such acts."

{6}    Henry Hill died shortly afterward.  In January 1965, the same group of individuals who had executed the Power of Attorney a year earlier executed a "Designation of Agent," this time appointing Jennie as their "agent and attorney in fact for the purpose of receiving, for their account, any and all royalties" which might be owed by the oil, gas, and mineral lessee from the 1959 agreement, which at that point in time was Pan American Petroleum Corporation.  The Designation of Agent form stated that "the interest owned by May Hasselman Kouns (deceased) has been vested in her children . . . share and share alike," and that "the interest shared by Jennie Hasselman Hill, and her late husband, Henry H. Hill, is now owned in its entirety by Jennie Hasselman Hill."  The 1964 designation also reflected that the Hasselman Women, along with Margaret's and Jennie's husbands, had entered into the 1959 lease agreement.

{7}    In March 1965, Jennie, acting "as agent for the heirs of Herman Hasselman," entered into an oil and gas lease with Claude Smith.  In June, the Pan American Petroleum Corporation prepared a division order title opinion[2] listing each of the three surviving Hasselman Women as owning a 1/8 share of the Property, and each of May's four children

---

[1] Claude Smith claimed ownership over the other one-half interest in the Property, and joined the Hasselman Women as a plaintiff to the quiet title lawsuit.  The district court in the 1958 action adjudged Claude Smith the owner of the other one-half interest, except for a small fractional share of mineral rights determined to belong to several other individuals. Claude Smith's interest in the Property eventually passed to Edwin Smith, LLC. As indicated above, Edwin Smith, LLC's property interests are not at issue here.

[2] A division order title opinion lists the ownership interests in an oil or gas well or lease to enable proper proportional distribution of royalties from oil and gas production. *See generally Maxwell v. Samson Res. Co.*, 848 P.2d 1166, 1168  (Okla. 1993).

as owning a 1/32 share. These fractional shares added to the one-half interest in the Property originally conveyed to the Hasselman Women. The division order title opinion also stated that by virtue of her appointment as agent, Jennie would receive royalties on behalf of the surviving Hasselman Women and May's children. Petitioners assert, and Respondents do not deny, that from the deaths of the first three Hasselman Women until the commencement of this lawsuit in 2006, each woman's heirs regularly received royalty payments from oil and gas extracted from the Property.

**{8}** Julia died in 1973, and Margaret died in 1974. In 1981, Jennie, the youngest and last surviving Hasselman Woman, executed a warranty deed purporting to convey an undivided one-half interest in the Property to herself and to her daughter June Hill Walmsley "as joint tenants." Jennie died in 1988. Although there is no evidence in the record confirming as much, Respondents claim that before her death in 1995, June Hill Walmsley deeded the Property through her will to a bypass trust bearing her name and administered by her husband, Jerry Walmsley. In 2004, some fifteen heirs of Julia, Margaret, and May purported to assign all or a portion of their interests in the Property to Petitioner Synergy Operating, LLC.

**{9}** In January 2006, Respondents filed the present action in the district court, requesting a judgment confirming their sole ownership of the Property as against Synergy Operating, LLC and numerous individuals identified as heirs, successors, and assigns of the Hasselman Women. In other words, Jerry Walmsley, on behalf of his wife's trust, sought ownership over the entire one-half interest in the Property that had been conveyed to the four Hasselman Women as joint tenants in 1951. Petitioners counterclaimed and cross-claimed both to quiet title in their favor and for an accounting of the proceeds of the oil and gas wells.

**{10}** The parties filed cross-motions for summary judgment, and in November 2007, the district court granted Respondents' motion. The court determined that a valid joint tenancy was created in 1951 when May's husband, having been deeded the Property, re-conveyed the Property to the Hasselman Women as joint tenants. The court concluded that "[p]rior to 1962, none of the [Hasselman Women] took any actions to sever the joint tenancy that had been created in 1951," but that "actions taken by Margaret, Julia and Jennie subsequent to May's death could indicate that the three women terminated their joint tenancy and agreed to hold their interests as tenants in common." Nonetheless, noting that the Hasselman Women did not "legally convey[] any interest in the property to other individuals, such as the descendants of May," the district court held that the joint tenancy remained intact and, after Jennie died, the estate passed to her daughter, June Hill Walmsley, and ultimately to her trust.

**{11}** Petitioners appealed, arguing that a joint tenancy in the Property never existed, and that even if a joint tenancy had been created, the Hasselman Women later terminated that tenancy by their course of conduct. *Edwin Smith, LLC v. Clark*, 2011-NMCA-003, ¶ 18, 149 N.M. 249, 247 P.3d 1134. The Court of Appeals affirmed the district court's determination

4

of title to the Property, and additionally vacated a separate order of the district court regarding suspension of proceeds from two oil and gas wells on the Property, an issue not before us here. *Id.* ¶¶ 1, 39, 47-48. With respect to the joint tenancy issue, the Court of Appeals agreed with the district court that the 1951 deed from Earl Kouns gave the Hasselman Women an ownership interest in the Property as joint tenants. *Id.* ¶¶ 33-35. The Court of Appeals then held that New Mexico recognizes two methods of terminating a joint tenancy: first, a conveyance or other act that destroys one or more of the "essential four unities of time, title, interest or possession," *id.* ¶ 28 (internal quotation marks and citation omitted), and second, a "severance by implication," which the Court of Appeals defined as "an express agreement between all of the joint tenants . . . [that] was inconsistent with one of the unities or with the right of survivorship," *id.* ¶ 31. Finally, the Court of Appeals determined as a matter of law that "[n]one of the alleged acts [of the Hasselman Women] destroyed one of the four unities that is necessary under either mode of severance recognized in New Mexico," and therefore affirmed the district court's grant of summary judgment to Respondents. *Id.* ¶ 38. Because Petitioners no longer challenge the valid creation of a joint tenancy in the Property, the sole question before us is whether the lower courts erred in granting summary judgment to Respondents with respect to termination of that joint tenancy.

## II. STANDARD OF REVIEW

**{12}** We review de novo the district court's grant of summary judgment to Respondents. *See Smith v. Durden*, 2012-NMSC-010, ¶ 5, 276 P.3d 943. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 1-056 (C) NMRA. "If the facts are not in dispute, and only the legal significance of the facts is at issue, summary judgment is appropriate." *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 16, 123 N.M. 752, 945 P.2d 970. "However, on appeal, when the trial court's grant of summary judgment is grounded upon an error of law, the case may be remanded so that the issues may be determined under the correct principles of law." *Id.*

## III. DISCUSSION

### A. Origin and Features of Joint Tenancy

**{13}** Joint tenancy is a form of concurrent ownership between two or more people with its origins in the thirteenth century. *See generally* Anne L. Spitzer, *Joint Tenancy with Right of Survivorship: A Legacy from Thirteenth Century England*, 16 Tex. Tech. L. Rev. 629 (1985). Scholars have suggested various purposes behind its development, including consolidating control of property to facilitate feudal lords' collection of payments and other "incidents of tenure." Robert W. Swenson & Ronan E. Degnan, *Severance of Joint Tenancies*, 38 Minn. L. Rev. 466, 466-67 (1954). *See* 2 Alfred G. Reeves, *A Treatise on the Law of Real Property* § 671, at 953-54 (1909); *see also DeWitt v. City of San Francisco*, 2 Cal. 289, 297 (1852) (Joint tenancy was "founded, like the laws of primogeniture, on the principle of the aggregation of landed estates in the hands of a few, and opposed to their

division among many persons."); *Armstrong v. Hellwig*, 18 N.W.2d 284, 285 (S.D. 1945) (In prior ages, "[t]he law favored joint tenancy rather than tenancy in common, because the latter estate tended to split up feudal services and hence to disorganize the feudal military system."). Another possible explanation, contrary to the first, is that joint tenancies emerged in part "to avoid the feudal incidents triggered by the death of a tenant," that is, to benefit tenants rather than feudal lords by reducing the tenants' obligations to their lords. Spitzer, *supra*, at 631.

**{14}** Like other forms of concurrent ownership such as tenancies in common, in joint tenancies "all the tenants have together, in the theory of the law, but one estate in the land and this estate each joint tenant owns conjointly with the other cotenants. . . . [E]ach joint tenant is regarded as the tenant of the whole for purposes of tenure and survivorship, while for purposes of alienation and forfeiture each has an undivided share only." 2 Herbert Thorndike Tiffany, *The Law of Real Property* § 418, at 196 (3d ed. 1939).

**{15}** Joint tenancy also incorporates features distinct from other forms of concurrent ownership. Right of survivorship is the "main difference between a joint tenancy and a tenancy in common," because upon the death of a tenant in common, that tenant's share passes to his or her heirs rather than to the cotenants. *United States v. Craft*, 535 U.S. 274, 280 (2002). By operation of the right of survivorship, often described as the "chief incident" of joint tenancy, "upon the death of one joint tenant, his interest does not pass to his heirs or representatives, but the entire tenancy remains to the surviving cotenants, and the last surviving tenant takes the whole." *Hernandez v. Becker*, 54 F.2d 542, 547 (10th Cir. 1931); *see also* 2 Tiffany, *supra*, § 419, at 198 (describing the right of survivorship as "[t]he leading characteristic of joint tenancy").

**{16}** In addition, courts and commentators have, at least since Blackstone, described joint tenancy as requiring the presence of "four unities":

> The properties of a joint estate are derived from it's [sic] unity, which is fourfold; the unity of interest, the unity of title, the unity of time, and the unity of possession: or, in other words, joint-tenants have one and the same interest, accruing by one and the same conveyance, commencing at one and the same time, and held by one and the same undivided possession.

2 Blackstone, *supra*, at 180 (emphasis omitted).

**{17}** "The requirement of four unities reflects the basic concept that there is but one estate which is taken jointly." *Tenhet v. Boswell*, 554 P.2d 330, 334 (Cal. 1976) (en banc). "'[U]nity of interest [means] that the joint tenants' shares are all equal and the duration and quality (legal or equitable) of their estates are the same.'" *Swink v. Fingado*, 115 N.M. 275, 286 n.15, 850 P.2d 978, 989 n.15 (1993) (quoting 4A Richard R. Powell, *The Law of Real Property* ¶ 617[1], at 51-9 (rev. ed. 1992)); *see also* 2 Tiffany, *supra*, § 418, at 197 (Unity of interest means "one cannot be joint tenant for life and another joint tenant for years; one

cannot be joint tenant in fee simple and the other joint tenant in tail."). "[U]nity of title means that . . . joint tenants had to acquire their interest by the same conveyancing instrument." *Zanelli v. McGrath*, 166 Cal. App. 4th 615, 629 n.10 (internal quotation marks and citation omitted). Unity of time "involves a necessity that the interests of all the joint tenants vest at the same time," 2 Tiffany, *supra*, § 418, at 197, a characteristic that almost always will be present when joint tenants acquire their interest from the same conveyance. Finally, unity of possession refers to the feature inherent in both joint tenancies and tenancies in common where "each . . . tenant is in possession of the whole estate, and . . . each is also entitled to an equal undivided share of the whole." *Swink*, 115 N.M. at 286 n.15, 850 P.2d at 989 n.15 (quoting 4A Powell, *supra*, ¶ 617[1], at 51-9).

**{18}** For at least the past several centuries courts have observed that "[f]ormerly joint tenancy was much favored, but for more than a century past the courts have laid hold of every available expression to construe estates given to a plurality of tenants as tenancies in common." *Lockhart v. Vandyke*, 33 S.E. 613, 613 (Va. 1899) (internal quotation marks and citation omitted). *See Chew v. Chew*, 1 Md. 163, 171 (1851) ("[T]his court is imperatively required by a long course of judicial decisions in this State and elsewhere . . . to view with disfavor[] estates in joint tenancy . . . ."). Few courts have examined why joint tenancies are disfavored, but the animating reason seems to be a historical solicitude for a property owner's heirs, because by operation of the right of survivorship the property would pass to the owner's cotenants instead of those heirs. *See Williams v. Dovell*, 96 A.2d 484, 488 (Md. 1953) ("[C]ourts have looked with favor upon the widow's claim to dower as a humane provision for the support of the widow and her children, and have allowed her claim except when denied by the clearest mandate of the law."); *see also Watford v. Hale*, 410 So .2d 885, 887 (Ala. 1982) (Jones, J., dissenting) (Joint tenancy has been "historically disfavored because of its survivorship feature which excludes heirs or next of kin of the deceased tenant.") (internal quotation marks and citation omitted).

## B.    Joint Tenancy in New Mexico

**{19}** Consistent with the common law principles outlined above, our statutes provide the following definition of a joint tenancy:

> A joint tenancy in real property is one owned by two or more persons, each owning the whole and an equal undivided share, by a title created by a single devise or conveyance, when expressly declared in the will or conveyance to be a joint tenancy, or by conveyance from a sole owner to himself and others, or from tenants in common to themselves, or to themselves and others, or from husband and wife when holding as community property or otherwise to themselves or to themselves and others, when expressly declared in the conveyance to be a joint tenancy, or when granted or devised to executors or trustees.

NMSA 1978, § 47-1-36 (1971).

**{20}**    As in other states, New Mexico recognizes but disfavors joint tenancies. *See Brown v. Jackson*, 35 N.M. 604, 606 4 P.2d 1081, 1081-82 (1931) ("American law has been in opposition to joint-tenancy and has shown more favor to tenancies in common." (quoting Christopher G. Tiedeman, *The American Law of Real Property* § 176 (3d ed. 1906)). This preference for tenancies in common over joint tenancies has been incorporated into our law since territorial times:  All interest in any real estate, either granted or bequeathed to two or more persons other than executors or trustees, shall be held in common, unless it be clearly expressed in said grant or bequest that it shall be held by both parties. NMSA 1978, § 47-1-15 (1851-52).

**{21}**    Our statutes also make clear that the designation of grantees as joint tenants "shall be construed to mean that the conveyance is to the grantees as joint tenants" with right of survivorship. NMSA 1978, § 47-1-35 (1947).  In addition,

> [a]n instrument conveying or transferring title to real or personal property to two or more persons as joint tenants . . . shall be prima facie evidence that such property is held in a joint tenancy and shall be conclusive as to purchasers or encumbrancers for value.  In any litigation involving the issue of such tenancy a preponderance of the evidence shall be sufficient . . . .

NMSA 1978, § 47-1-16 (1955).  In other words, while joint tenancies are disfavored under New Mexico law, if they are validly created, they are entitled to legal recognition—unless and until they are terminated.

## C.    Terminating a Joint Tenancy

**{22}**    Our statutes, while voluble on the subject of creating a joint tenancy, are silent as to its termination.[3]  In this Court's principal decision concerning termination of a joint tenancy, *Romero v. Melendez*, 83 N.M. 776, 498 P.2d 305 (1972), Pedro and Celene Melendez divorced a few months before Pedro's death.  The administrator of Pedro's estate brought an action against Celene to determine the ownership of certain items of personal property, including a checking account and the fund certificate that the Melendezes had held in joint tenancy, which the couple's divorce decree awarded to Pedro.  *Id.* at 776, 498 P.2d at 305. The Court held that the monies in the checking account and fund certificate belonged to Pedro's estate because the "decree severed and dissolved the joint tenancy."  *Id.* at 776-77,

---

[3] We employ the word "termination" to indicate the end of a joint tenancy and its conversion into a tenancy in common.  Although we note that many other courts, including our Court of Appeals, use the term "severance" to indicate the total destruction of a joint tenancy, we believe "severance" indicates that one or more property owners have become tenants in common, while an additional owner or owners continue to be held out as joint tenants.  In a joint tenancy with only two owners, of course, a severance would equal a termination.

8

498 P.2d at 305-06. We reached this result almost entirely by reference to two decisions from the Kansas Supreme Court, including *Carson v. Ellis*, 348 P.2d 807 (Kan. 1960), which *Romero* quoted to explain the essential qualities of a joint tenancy and the manners in which a joint tenancy could be terminated:

> A joint tenancy will be severed by the destruction of any one or more of its necessary units. * * *
>
> * * * (A) joint tenancy may be terminated by a mutual agreement between the parties * * *, *or* by any conduct or course of dealing sufficient to indicate that all parties have mutually treated their interests as belonging to them in common.

(emphasis added) (quoting *Carson*, 348 P.2d at 809-10) (internal quotation marks and citations omitted). Emphasis added, brackets indicate text from *Carson* omitted from *Romero*. *Romero* thus identifies three ways that a joint tenancy may be terminated: (1) by destruction of one or more of the four unities, (2) by mutual agreement, or (3) by certain conduct or course of dealing.[4]

**{23}**     While instructive, *Romero* can only serve as the starting point of our inquiry. First, the property at issue in that case was personal property rather than real property. Second, insofar as *Romero* adopts *Carson*'s statement that a mutual agreement or "conduct or course of dealing" could effect a termination, 83 N.M. at 778, 498 P.2d at 307 (internal quotation marks and citation omitted), that language is dicta because the Melendezes divorce decree was neither; rather, we held that the decree "operate[d] to destroy the joint tenancy by eliminating the unity of possession." *id.* at 779, 498 P.2d at 308. Third, *Romero* does not explain which acts destroy "one or more of [the] necessary units" of a joint tenancy, nor what type of conduct or course of dealing is sufficient to evidence the joint tenants' intent to treat their interest as a tenancy in common. *Id.* At 778, 498 P .2d at 307 7(internal quotation marks and citation omitted). But these facts do not invalidate *Romero*; they simply prompt us to undertake a more searching exploration of the principles ultimately adopted in that case.

**{24}**     It is widely accepted that a conveyance of property to a third party will terminate a joint tenancy. *See Edwin Smith, LLC*, 2011-NMCA-003, ¶ 28. This is the case even if the conveyance is made over the objections of one of the joint tenants, *see Hughes v. Hughes*, 101 N.M. 74, 75, 678 P.2d 702, 703 (1984), because "[a] conveyance by a cotenant destroys

---

[4] Some courts have taken a different conceptual approach, treating the requisite conduct or course of dealing as an implied agreement to terminate. *See, e.g.*, *Duncan v. Suhy*, 37 N.E.2d 826, 829 (Ill. 1941). Although the outcome of this appeal would be the same under either approach, this Opinion treats conduct or course of dealing as a separate manner of terminating a joint tenancy.

the unity of title and converts the joint tenancy into a tenancy in common," *Houpt v. Houpt*, 174 S.W.3d 92, 95 n.5 (Mo. Ct. App. 2005); (alteration in original) (internal quotation marks and citation omitted). One joint tenant can even sever the joint tenancy as to himself or herself, and therefore *terminate* the joint tenancy if it is held by only two people, by unilateral self-conveyance. *See Taylor v. Canterbury*, 92 P.3d 961, 965 (Colo. 2004) (en banc) ("[A] joint tenant has the absolute right to terminate a joint tenancy unilaterally.").

**{25}**     As *Romero* indicated, however, termination of a joint tenancy does not in every instance require destruction of one or more of the four unities; it can also be effected by an agreement or course of conduct between the joint tenants. 83 N.M. at 778, 498 P.2d at 307 (quoting *Carson*, 348 P.2d at 809-10). Although *Carson* was the direct source cited in *Romero*, the principle was not invented by the Kansas Supreme Court *Carson* case; it has been recognized in treatises and judicial decisions for well over a century that under the common law, joint tenants by their overt actions may destroy the joint tenancy, and thereby convert it into a tenancy in common. *See* A.C. Freeman, *Cotenancy and Partition: A Treatise on the Law of Co-Ownership as it Exists Independent of Partnership Relations Between the Co-Owners* § 32, at 87, (Severance may "be inferred from any . . . course of dealing between the tenants manifesting an intent to change the joint holding."). *Carson*'s stated methods for terminating joint tenancies were based on two treatises, a Corpus Juris Secundum article, and an earlier Kansas case, *Berry v. Berry's Estate*, 212 P .2d 283 (Kan. 1949), which itself cited to an article from American Jurisprudence. *Carson*, 348 P.2d at 810 (*see Berry*, 212 P.2d at 286; 48 C.J.S. *Joint Tenancy* § 4, at 928; 2 Tiffany, *supra*, § 425; *and* Freeman, *supra*, §§ 29-31, at 86). Those secondary authorities, as well as an opinion by the New Hampshire Supreme Court, trace the origins of the principle to a series of decisions from equity courts in England and Ireland. *See Mamalis v. Bornovas*, 297 A.2d 660, 661-62 (N.H. 1972) ("Beginning with several eighteenth and nineteenth century English decisions . . . the idea began to emerge that the termination of a joint tenancy should be controlled by the parties' intention as manifested by some overt act or express agreement."). Our review leads us to believe, however, that no published opinion of an American court has examined the facts and holdings of the nineteenth century cases providing that agreements or course of conduct may terminate a joint tenancy.

**{26}**     The progenitor of the principle espoused in *Carson* and cited as law by *Romero* is *Williams v. Hensman*, 1 Johns. & H. 546, 70 Eng. Rep. 862 (1861), a case arising out of the dealings of eight siblings who had been left an interest in a fund. Among other acts, some of the siblings mortgaged their shares of the fund, and one had executed a marriage settlement and assigned her share to the trustees of that settlement. *Id.*, 1 Johns. & H. at 550-51, 548, 70 Eng. Rep. at 864, 863. *Williams* concluded that:

> A joint-tenancy may be severed in three ways: in the first place, an act of any one of the persons interested operating upon his own share may create a severance as to that share. . . . Secondly, a joint-tenancy may be severed by mutual agreement. And, in the third place, there may be a severance by any course of dealing sufficient to intimate that the interests of all were mutually

10

treated as constituting a tenancy in common.

*Id.*, 1 Johns. & H. at 557, 70 Eng. Rep. at 867.

{27}    Two earlier cases, both cited in *Williams*, provide its conceptual foundation.  The first case, *Jackson v. Jackson*, 9 Ves. Jun. 591 (1804), involved a bequest of business premises to  two brothers as joint tenants.  The brothers engaged in business, apparently as partners.   When one died and his widow initiated proceedings for half of the property, the surviving brother claimed he was entitled to the entirety by virtue of the right of survivorship.  *Id.* at 591-92, 599.  Although the outcome of the case may well have hinged on the then-prevailing view that the right of survivorship did not apply to merchants, the Lord Chancellor explained that "the course of dealing" between the brothers "ought to be taken as evidence, that they meant to sever the joint tenancy as to both."  *Id.* at 604.  That "course of dealing" included the fact that the brothers "sever[ed] their interests as to more or less of profit or capital," that "each of them thought the other at liberty to take money out of the property," and that the surviving brother originally thought his brother's widow entitled to take half of the property.  *Id.* at 602-03.  While these specific actions would not terminate a joint tenancy by the standards of a contemporary American court applying the common law, *Jackson* demonstrates that courts of equity as early as the beginning of the nineteenth century recognized that joint tenants' actions *other than* formal conveyances could indicate the owners' intent to hold the property as tenants in common.

{28}    *Williams* also found guidance in *Wilson v. Bell*, 5 Ir. Eq. Rep. 501 (1843), a case that involved the bequest of personal property, in this instance to a life tenant, the testator's widow, and thereafter to five residuary legatees as joint tenants.  The Irish Equity exchequer chamber found that

> [f]rom 1820, when the rights of the parties accrued by the death of the widow, down to 1841, when the last bill was filed, there has been but one course of dealing, without a shadow of a contrary intention . . . that of dealing with [the] property as if held in common.  *Id.* at 507-08.

The exchequer chamber went on to explain that

> [t]here has been, in this case, an acting and dealing with the outstanding property, which is wholly inconsistent with the notion that the joint-tenancy had not been severed; and with respect to the property in possession, it has been dealt with as if the legatees were tenants in common of it; it was divided into fifths.  *Id.* at 509.

{29}    The exchequer chamber was particularly concerned that the heirs who would be dispossessed by upholding joint tenancy had been induced to take certain actions, such as collectively assuming certain liabilities, on the mutual understanding that they held the property in common.  It would be "impossible to permit" the surviving original legatee, who

11

sought ratification of the joint tenancy, to claim the benefits of joint tenancy after many years of enjoying the benefits of tenancy in common. *Id.*

**{30}** *Williams* refined the concepts discussed in *Jackson* and *Wilson*, explaining that "[w]hen the severance depends on an inference . . . without any express acts of severance" such as a conveyance, "it will not suffice to rely on an intention, with respect to the particular share, declared only behind the backs of the other persons interested." *Williams*, 1 Johns. & H. at 557-58, 70 Eng. Rep. at 867. That limitation is important because it prevents disputes over the ongoing existence of a joint tenancy from resting on self-serving testimony from a tenant about what he or she believed, felt, or even articulated, absent a mutual course of conduct by all of the tenants. The rationale for implying a termination based on the joint tenants' course of conduct is that it would be inequitable to allow the joint tenants to mutually treat the property as a tenancy in common when it suited their interests, only to have one or more of those tenants at a later time effectively renounce their earlier representations. *See id.*, 1 Johns. & H. at 561, 70 Eng. Rep. at 868 ("[I]t would be most inequitable to treat it as a joint-tenancy when all the parties, whether in ignorance or not, have dealt with their interests as several."); *Wilson*, 5 Ir. Eq. Rep. at 509 ("Is it to be said that, after having obtained the assistance of the representatives of the two deceased legatees . . . the surviving legatee may turn round on them and say that they have no title to any portion of the residue? I think not.").

**{31}** While it did not explicitly acknowledge doing so, *Romero* thus relied on common law principles that far predated *Carson* when it explained that a joint tenancy may be terminated by the three methods of destruction of one or more of the unities, mutual agreement, or mutual conduct. In the present action, the Court of Appeals, while giving cursory acknowledgment to *Romero* by stating that "a joint tenancy may be severed by mutual agreement or by any conduct or course of dealing sufficient to indicate that all parties have mutually treated their interests as belonging to them in common," immediately thereafter conflated those two methods into a category it defined as "severance by implication." *Edwin Smith, LLC*, 2011-NMCA-003, ¶ 31. While it is correct that both mutual agreement and course of conduct are "by implication" in that they do not represent an actual conveyance of property, the Court of Appeals went further, holding that "[w]hether a severance by implication has occurred turns on two questions: (1) whether there was an express agreement between all of the joint tenants; and (2) whether that agreement was inconsistent with one of the unities or with the right of survivorship." *Id.* The Court of Appeals based this proposition on a 1957 law review comment. *Id.* (citing Harold J. Romig, Jr. & John M. Shelton, Comment, *Severance of a Joint Tenancy in California*, 8 Hastings L.J. 290, 294 (1957)). The comment is silent as to whether course of conduct may terminate a joint tenancy, and very well may have simply overlooked (or opted not to discuss) cases supporting termination on that basis. *See id.*

**{32}** As our review of prior caselaw indicates, the Court of Appeals' test for severance by implication misstates the common law in two ways. First, the test ignores mutual conduct as a method of termination, instead limiting acts sufficient to effect termination only to

12

express agreements. *Edwin Smith, LLC,* 2011-NMCA-003, ¶ 31. Second, the test restricts termination even further by requiring that the express agreement be "inconsistent with one of the unities or with the right of survivorship." *Id.* While our statutes make clear that the four unities of interest, title, time, and possession must be present for a joint tenancy to be created, Section 47-1-36, there is no corresponding statutory provision limiting termination to acts that destroy one or more of the four unities. As *Carson* held, in language adopted by *Romero*, destruction of one or more of the four unities is only one, but not the only, method of terminating a joint tenancy. *Romero*, 83 N.M. at 778, 498 P.2d at 307 (quoting *Carson*, 348 P.2d at 809-10).

**{33}** We observe that unlike New Mexico, some other states have opted to restrict by statute the manner in which joint tenancies may be terminated. For example, Minnesota law recognizes termination only if (1) an "instrument of severance" is either recorded in the office of the recorder or registrar of titles where the real property is located, or executed by all of the joint tenants; (2) "the severance is ordered by a court of competent jurisdiction"; (3) the "severance is effected pursuant to bankruptcy of a joint tenant"; or (4) by virtue of a divorce decree. Minn. Stat. § 500.19 Subd. 5 (1979, as amended through 1994). Minnesota courts have recognized that the statute abolishes methods of termination previously authorized under state law. *See Wendt v. Hane*, 401 N.W.2d 457, 459 (Minn. Ct. App. 1987). In a similar vein, Nebraska's real property laws include a provision that "[t]here shall be no severance of an existing joint tenancy in real estate when all joint tenants execute any instrument with respect to the property held in joint tenancy, unless the intention to effect a severance expressly appears in the instrument." Neb. Rev. Stat. § 76-2,109 (1979). There too, the statute eliminated previously-available methods of ending a joint tenancy. *See Cook v. Hall*, 778 N.W.2d 744, 750 (Neb. App. 2009) (explaining that statute likely abrogated a prior state supreme court decision, *Hughes v. de Barbieri*, 107 N.W.2d 747 (Neb. 1961), which held that a contract to sell real estate effected termination). Our Legislature has not to date followed such an approach. In light of the well-established common law principle that a joint tenancy may be terminated by conduct evidencing the parties' mutual intent to terminate, and mindful of joint tenancy's disfavored status, absent a clear legislative mandate to do so, we will not impose restrictions on terminating a joint tenancy in derogation of the common law. *See Sims v. Sims*, 1996-NMSC-078, ¶ 22, 122 N.M. 618, 930 P.2d 153 ("[N]o innovation upon the common law that is not clearly expressed by the legislature will be presumed.").

**{34}** Finally, there is further reason to reaffirm *Romero* and its common law ancestors, and recognize that joint tenancies may be terminated by course of conduct, rather than limiting means of termination to conveyances and express agreements that destroy one of the unities. In the case of a valid conveyance, the destruction of the unities is self-executing and self-evident; title, and with it interest and possession, have passed to the grantee, and no longer remain with the joint tenant grantor or grantors. With respect to acts other than conveyances, however, the analytical value of the four unities shrinks considerably, it does not disappear altogether. *See* Charles Sweet, *Challis' Law of Real Property*: Chiefly in Relation to Conveyancing, at 367 (3d ed. 1911) (The four unities analysis "has perhaps

attracted attention rather by reason of its captivating appearance of symmetry and exactness, rather than reason of its practical utility."). First, there are other acts that do not in and of themselves destroy one of the unities that nonetheless are widely viewed as effecting a termination. For example, if one joint tenant deliberately kills another, courts frequently determine the joint tenancy to have terminated. *See Johansen v. Pelton*, 8 Cal. App. 3d 625, 627 (Cal. Ct. App. 1970) (When one joint tenant murders another, "equity will be best applied by providing that the joint tenancy be deemed severed by the slaying."). Even express agreements, such as settlements made in divorce proceedings, do not by themselves destroy one of the unities, yet those agreements may be found "sufficient to cause destruction of the four unities by implication." *Young v. McIntyre*, 672 S.E. 2d 196, 203 (W. Va. 2008). Similarly, contracts for the future sale of property held in joint tenancy do not in and of themselves destroy one or more of the unities, yet they are routinely treated as doing so. *See Buford v. Dahlke*, 62 N.W.2d 252, 255-56 (Neb. 1954) ("A contract by one joint tenant to convey his interest to a stranger severs a joint tenancy since equity regards that as done what in good conscience ought to be done."). There is no principled difference between determining that an express agreement destroys one or more of the unities by implication, and extending that same reasoning to allow termination by a mutual course of conduct. Prompted by equitable concerns, our common law recognizes the viability of both methods of termination.

## IV.    CONCLUSION

{35}    We hold that, under *Romero*, a joint tenancy may be terminated by the owners' course of conduct. Intent per se is not determinative; the question is whether the Hasselman Women by their actions (between their reacquisition of the Property as joint tenants in 1951 and Jennie's purported conveyance of the Property to herself and her daughter in 1981) evidenced their mutual understanding and desire to hold the Property as tenants in common rather than as joint tenants. The record shows that the Hasselman Women included some of their husbands and heirs in decision making about the Property, or at the very least in executing legal documents affecting the Property, and those third parties also received many years of royalties from oil and gas development on the Property. The finder of fact is in the best position to evaluate the evidence of the Hasselman Women's conduct and to determine if that conduct rose to a level sufficient to show their intent to terminate the joint tenancy. Because the extent and intent of the Hasselman Women's conduct rest on unresolved questions of fact, the district court's summary judgment was inappropriate. Accordingly, we reverse both the district court and the Court of Appeals, and remand for further proceedings consistent with this Opinion.

{36}    **IT IS SO ORDERED.**

_____

**PATRICIO M. SERNA, Justice**

**WE CONCUR:**

14

_____

**PETRA JIMENEZ MAES, Chief Justice**


_____

**RICHARD C. BOSSON, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**


_____

**CHARLES W. DANIELS, Justice**

**Topic Index for** _Edwin Smith, LLC v. Walmsley_**, No. 32,707**

**APPEAL AND ERROR**
Standard of Review

**NATURAL RESOURCES**
Oil and Gas

**PROPERTY**
Conversion
Joint Tenancy
Quiet Title
Tenancy in Common